[Cite as *Arthur v. Arthur*, 2012-Ohio-1893.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
SHELBY COUNTY

MARTHA J. ARTHUR,

    PLAINTIFF-APPELLEE,            CASE NO.  17-11-28

    v.

VERNON ARTHUR,                  O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Shelby County Common Pleas Court
Domestic Relations Division
Trial Court No. 10DV000170

Judgment Affirmed

Date of Decision:   April 30, 2012

APPEARANCES:

    *Stanley R. Evans and R. Eric Sanders*  for Appellant

    *Timothy S. Sell and Breann M. Zickafoose*  for Appellee

Case No. 17-11-28

**SHAW, P.J.**

{¶1} Defendant-appellant, Vernon Arthur ("Vernon"), appeals the July 27, 2011 judgment of the Shelby County Court of Common Pleas, Domestic Relations Division, awarding spousal support to plaintiff-appellee, Martha J. Arthur ("Marty"), in the amount of $1,600.00 per month for an indefinite period of time. Vernon also appeals the June 17, 2011 decision of the same court sustaining Marty's objection to the magistrate's decision awarding her $929.59 in spousal support for an indefinite period of time.

{¶2} Vernon and Marty were married in 1963. During their forty-seven-year marriage, Vernon was the breadwinner and Marty stayed at home, tending to the household and raising the parties' two children, both of whom are now emancipated.

{¶3} On July 27, 2010, Marty filed a complaint for legal separation and a motion for temporary spousal support.

{¶4} On August 19, 2010, a hearing was held on Marty's motion for temporary spousal support. Marty testified that her only income was $573.00 per month in social security and that Vernon received $5,579.54 per month in disability, social security, and pension benefits. Marty requested the magistrate equally divide the total monthly income between the parties of $6,152.54, so that each party would receive $3,076.27 a month. In order to accomplish this, Vernon

-2-

would have to pay Marty $2,503.27 a month in temporary spousal support in addition to the $573.00 a month she received in social security. Vernon appeared at this hearing pro se and did not offer any evidence or testimony to rebut the evidence put on by Marty. After the hearing, Vernon retained counsel.

{¶5} On August 30, 2010, Vernon filed an answer to Marty's complaint for legal separation and filed a counterclaim for divorce, claiming the parties are incompatible.

{¶6} On September 13, 2010, the magistrate ordered Vernon to pay Marty $2,503.27 a month in temporary spousal support effective August 1, 2010. On September 22, 2010, Vernon filed a motion to set aside or modify the temporary spousal support order.

{¶7} On October 15, 2010, the trial court ruled on Vernon's motion to set aside or modify the temporary spousal support order and remanded the matter to the magistrate, stating that Vernon's motion indicated there may be evidence that was not available to the magistrate in rendering his prior ruling on temporary spousal support. This particular evidence concerned Marty's actions of withdrawing approximately $250,000.00 from several of the parties' bank accounts. At a second hearing on temporary spousal support, Marty admitted to withdrawing this money because she feared that Vernon would drain the accounts to purchase a new home, thereby depriving her of her share of the marital assets.

It is undisputed by the parties that Marty never spent the $250,000.00 or the interest to support herself. Thus, the sum total was preserved during the pendency of these proceedings and was eventually distributed as part of the property settlement in the divorce. Therefore, the magistrate ultimately concluded that the issue of temporary spousal support was a moot point and that neither party owed the other additional monies as a result of the temporary spousal support award.

{¶8} On December 17, 2010, the parties appeared before the magistrate for the final hearing on Marty's claim for legal separation and Vernon's counter-claim for divorce. On the record, the parties stipulated to the division of the marital assets, both tangible and intangible, resulting in an equal distribution of $427,000.00 to each party. The only issue before the magistrate was the award of spousal support to Marty. At the hearing, both Marty and Vernon testified to their monthly income and expenses. Vernon also offered the testimony of Bruce Dickman, a financial representative for Northwestern Mutual Financial Network, who testified that Marty could purchase an annuity with the cash assets she received in the divorce to generate an additional monthly income. After the conclusion of the evidence, the magistrate determined that Vernon should pay Marty $929.59 in spousal support for an indefinite period of time. The magistrate also recommended that the trial court should not retain jurisdiction over the issue of spousal support.

{¶9} On January 21, 2011, Marty filed objections to the magistrate's decision and requested an extension of time to file supplemental objections upon the preparation and filing of a transcript of the December proceedings. On April 29, 2011, after the preparation and filing of the transcript, Marty filed a memorandum in support of her objections to the magistrate's decision, arguing that she is entitled to $2,169.00 a month in spousal support and maintaining that the magistrate erred in only awarding her $929.59 in spousal support. On May 12, 2011, Vernon filed his response to Marty's objections.

{¶10} On June 17, 2011, the trial court issued its ruling on Marty's objections to the magistrate's decision. Upon reviewing the evidence and considering the arguments of counsel and the statutory factors listed in R.C. 3105.18(C)(1), the trial court concluded that Vernon should pay Marty spousal support in the amount of $1,600.00 per month. Thus, the trial court increased the magistrate's award of spousal support by $670.41 a month. The decision of the trial court to increase the amount of spousal support to Marty was subsequently included in the parties' decree of divorce, which was journalized by the trial court on July 27, 2011.

{¶11} Vernon now appeals from this judgment, asserting the following assignments of error.

## ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ABUSED ITS DISCRETION IN DETERMINING THE AMOUNT OF MONTHLY SPOUSAL SUPPORT, IF ANY, WHICH APPELLANT SHOULD BE REQUIRED TO PAY IN ORDER TO MEET APPELLEE'S PURPORTED MONTHLY NEEDS BY FAILING TO INCLUDE IN SUCH DETERMINATION, THE AMOUNT OF INCOME WHICH THE COURT HELD SHOULD BE IMPUTED TO APPELLEE.**

## ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ERRED AS A MATTER OF LAW BY IMPROPERLY TREATING SPOUSAL SUPPORT AS A DISTRIBUTION OF MARITAL PROPERTY WHEN IT HELD THAT SUBSEQUENT TO THE TERMINATION OF THE PARTIES' MARRIAGE, APPELLEE WAS ENTITLED TO RECEIVE A BENEFIT FROM APPELLEE'S [SIC] CONTINUING INCOME OVER AND ABOVE THE APPROPRIATE AWARD OF SPOUSAL SUPPORT NECESSARY FOR APPELLEE TO MAINTAIN AN IDENTICAL STANDARD OF LIVING WHICH APPELLEE ENJOYED DURING THE MARRIAGE.**

## ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT ERRED BY ADDRESSING APPELLEE'S EXTRANEOUS ARGUMENT AS TO THE AMOUNT OF SPOUSAL SUPPORT WHICH THE MAGISTRATE HAD RECOMMENDED APPELLEE RECEIVE, AS APPELLEE DID NOT SPECIFICALLY OBJECT TO THE AMOUNT OF SPOUSAL SUPPORT WHICH THE MAGISTRATE HAD RECOMMENDED IN THE MAGISTRATE'S DECISION AS REQUIRED UNDER CIV. R. 53(D)(3)(B)(ii).**

{¶12} Due to the similar nature of Vernon's first and second assignments of error, we elect to address them together.

*First and Second Assignments of Error*

**{¶13}** In his first assignment of error, Vernon claims the trial court abused its discretion in its calculation of spousal support because it failed to include certain income to be "imputed" to Marty. In his second assignment of error, Vernon claims the trial court's order of spousal support is contrary to law because it entitles Marty to a post-divorce benefit from Vernon's continued income stream and attempts to equalize the income between the parties. Vernon also argues that the trial court's spousal support award provides Marty with a standard of living in excess of the one she enjoyed while married to him.

**{¶14}** A review of a trial court's decision relative to spousal support is governed by an abuse of discretion standard. *Cherry v. Cherry*, 66 Ohio St.2d 348 (1981). We cannot substitute our judgment for that of the trial court unless, when considering the totality of the circumstances, the trial court abused its discretion. *Holcomb v. Holcomb*, 44 Ohio St.3d 128 (1989). To find an abuse of that discretion, we must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶15}** Revised Code Section 3105.18(C)(1)(a) through (n) sets forth the factors that a trial court must consider in determining whether spousal support is

appropriate and reasonable and in determining the nature, amount, terms of payment, and duration of spousal support. These factors are:

**(a)   The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;**

**(b)   The relative earning abilities of the parties;**

**(c)   The ages and the physical, mental, and emotional conditions of the parties;**

**(d)   The retirement benefits of the parties;**

**(e)   The duration of the marriage;**

**(f)   The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;**

**(g)   The standard of living of the parties established during the marriage;**

**(h)   The relative extent of education of the parties;**

**(i)   The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;**

**(j)   The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;**

**(k)   The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;**

**(l)　The tax consequences, for each party, of an award of spousal support;**

**(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;**

**(n)　Any other factor that the court expressly finds to be relevant and equitable.**

R.C. 3105.18(C)(1).　The testimony at the final hearing established the following facts relative to the consideration of these statutory factors.

**{¶16}** At the time of the final hearing, Vernon was seventy-two-years-old and Marty was seventy-years-old.　As previously stated, the parties stipulated to a division and distribution of the marital assets which entitled each party to an equal portion of the assets totaling approximately $427,000.00.　The following is the distribution of the marital assets between the parties.

| **Vernon** | | **Marty** | |
|---|---|---|---|
| Globe Life Insurance Property Policy | $1,257.00 | Money Market | $132,907.00 |
| Prudential Life Insurance Policy | $13,799.00 | Gold Preferred Check | $7,788.00 |
| Prudential Life Insurance Policy | $12,237.00 | 1st National Bank CD | $10,631.00 |
| Prudential Life Insurance Policy | $8,532.00 | 1st National Bank CD | $114,527.00 |
| National Guard Life Policy | 6,320.00 | 5/3 Bank IRA | $48,053.00 |
| National Guard Life Policy | $3,164.00 | Golf Cart | $2,500.00 |
| 1st National Account | $1,973.00 | House at Dorothy Love | $151,443.00 |
| 5/3 Account | $58,224.00 | | |
| 401K | $268,878.00 | | |
| 2009 Impala | $12,610.00 | | |
| **Total** | **$386,994.00** | **Total** | **$467,849.00** |

In order to equalize the value of the marital assets received by each party in the divorce, Marty paid Vernon the sum of $40,418.00 from the liquid assets in her column. The parties agree that the distribution of the marital assets is fair and equitable. Thus, the only issue submitted to the magistrate and the trial court was the amount of spousal support to be awarded to Marty.

{¶17} Marty testified that her monthly income is $1,066.77, which consists of her social security income and half of the income stream generated from Vernon's Sprint pension.[1] Marty testified that her total monthly expenses amount to $3,235.00. Marty explained that a significant portion of these monthly expenses are related to the cost of her prescription drugs, which substantially increases upon the trial court granting the parties a divorce, and the necessity of her having to purchase supplemental insurance to alleviate some of her increased medical costs. Marty further explained that despite being on Medicare, her monthly medical expenses are increasing due to the fact that she is no longer covered under Vernon's Veteran's benefits, which heavily subsidized the cost of her prescriptions. Specifically, Marty testified that her monthly expenses for prescriptions will increase from two to three hundred dollars a year, being covered

---

[1] In the Qualified Domestic Relations Order ("QDRO") entered in this case, the parties agreed to equally divide Vernon's Sprint pension, which produces a total monthly income stream of $987.54. A QDRO is an order in aid of execution on the property division ordered in the divorce decree dividing retirement or pension assets. More specifically, it is an order that "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefit payable with respect to a participant under a plan * * *." Employee Retirement Income Security Act of 1974, Section 206(d)(3)(B)(i)(I).

under Vernon's benefits, to five to six thousand dollars a year without those benefits.

{¶18} Marty also testified that she and Vernon have lived in an independent living residence on the grounds of Dorothy Love, a retirement community. The evidence demonstrates that Marty and Vernon paid a $171,000.00 "entrance fee" for the right to live on the premises for the rest of their lives. The parties testified that if they choose to move out at this point, they would be entitled to receive a refund of their "entrance fee" of approximately $151,000.00. Marty testified that she planned to continue to live at Dorothy Love after the granting of the divorce. However, Vernon no longer lives in the residence at Dorothy Love and plans to purchase a home of his own. Thus, the right to receive the refund of the remaining $151,000.00 "entrance fee" was accounted for in the parties' stipulated property settlement and made up a portion of Marty's total $427,000.00 share of the marital assets distributed in the divorce. Notwithstanding the payment of this "entrance fee," Marty testified that she still is required to pay a monthly "rent" fee to Dorothy Love of $1,096.00.

{¶19} Marty testified that she never worked during the parties' marriage and that her primary responsibility in the marriage was to take care of the children and the household. Marty explained that she did not have any retirement income of her own due to her role in the marriage and not working outside of the home

during the marriage. Therefore, she has been and still is dependent on Vernon's income stream. Marty testified that she suffers from poor health and is not able to work in this stage of her life. Marty further explained that she has no education or training which would allow her to enter the workforce. Marty testified that she was seeking a spousal support award in the amount of $2,168.23, which is the difference between her monthly income of $1,066.77 and her monthly expenses of $3,235.00. Marty maintained that receiving $2,168.23 a month in spousal support would allow her to continue to enjoy the same standard of living that she had during the marriage.

{¶20} Vernon testified that he receives a monthly income of $5,085.77, which consisted of his social security income, his veteran's disability income, and half of the income stream generated from his Sprint pension. Vernon explained that he is 80% disabled and receives disability income from the Veteran's Administration at disability rate of 100%. Vernon testified that his monthly expenses are $2,811.00. However, Vernon admitted that $1,000.00 of that monthly figure included payment for attorney fees for the divorce, which would not be an ongoing expense, and thus conceded that his monthly expenses are presently $1,811.00.

{¶21} Vernon confirmed that Marty never worked outside the home during the marriage and that he was the primary breadwinner throughout the duration of

their forty-seven-year marriage. He also recalled that one of the reasons they decided to move into Dorothy Love was because he was facing four operations and Marty felt she was no longer capable of taking care of him. He also recalled Marty discussing her fear that she would eventually have to move into an assisted living apartment due to her declining health. Vernon testified that he is currently living with his daughter. Vernon further explained that he intends to buy a home and to have his daughter and her children move in with him.

{¶22} Vernon also offered the testimony of Bruce Dickman, a financial representative with Northwestern Mutual Financial Network. At the request of Vernon's counsel, Dickman prepared a report which explained three annuity options available to Marty if she chose to invest $235,000.00 of the liquid assets she received as part of the property settlement in the divorce. The most conservative plan of the three options would pay Marty a monthly income of $1,238.64 and had a guaranteed payout for at least twenty years. More specifically, the plan guaranteed Marty a lifetime monthly payment; however, if Marty were to pass away within twenty years of purchasing the annuity, the beneficiary of her estate would only be entitled to payments for the remaining part of the twenty-year period. Dickman testified that at the end of the twenty-year period the annuity would be worth $297,273.00, demonstrating that Marty would eventually receive a substantial return on her initial $235,000.00 investment.

{¶23} Dickman testified that his calculations of the annuity options were based solely on Marty's age and the amount of money Vernon's counsel indicated she could invest. Dickman admitted that he had no personal knowledge of Marty's particular circumstances and that Marty did not authorize him to do any financial planning on her behalf. He also conceded that it is difficult to provide investment advice or to make a specific recommendation to someone without knowing the facts of his or her financial situation, for example the makeup of the financial assets and other income streams available to that individual, or the circumstances of that particular individual's long-term health care needs. Moreover, Dickman testified that Marty would have to live 15.8 years to reap the full benefit of the $235,000.00 placed in the annuity and that she would have to live beyond those 15.8 years before she began to receive a return on her investment. Dickman also testified that Vernon had the same options of investing his liquid assets from the divorce into an annuity, but that he was not asked to analyze any scenarios involving Vernon's money for the purposes of his testimony at the hearing.

{¶24} On cross-examination, Vernon's counsel questioned Marty about her plans to use the liquid assets she received in the divorce property settlement and further questioned her regarding the possibility of purchasing an annuity described by Dickman. Marty expressed concern with "running out of money." In

particular, Marty explained that she feared a further deterioration of not only her physical health but also her mental health and described that she has already begun to experience a decline in her memory and her comprehension as well as her ability to manage her money and to take her medication as prescribed. Marty worried that this deterioration of her independence would force her to have to move from her current residence, in an independent living home on the grounds of the retirement community, into an assisted living apartment or a room in the nursing facilities. She explained that she already has her name on a list to receive an assisted living apartment to provide her access to increased care. Marty testified that if this were to happen her cost of living would increase significantly and she would need to be able to access her liquid assets. Marty testified that even if she were to leave Dorothy Love, it would only be to move to another retirement community with similar facilities and a similar requirement of a substantial "entrance fee."

{¶25} After hearing the evidence presented by the parties, the magistrate issued his decision on the award of spousal support to Marty. The magistrate noted that he considered the statutory factors in R.C. 3105.18(C)(1). In his decision, the magistrate specifically discussed the stipulated property settlement between the parties. The magistrate also found the testimony of Bruce Dickman to be particularly persuasive and noted that Marty had the option of obtaining

additional income by purchasing an annuity, under the most conservative of the three plans presented by Dickman, which would generate an income of $1,238.64 per month. The magistrate then added this potential income to the $1,066.77 per month Marty already received from her social security and half of Vernon's pension and concluded that these two figures together would result in Marty receiving a monthly income of $2,305.41 per month. The magistrate determined that Marty would then only need an additional $929.59 a month to meet her monthly expenses of $3,235.00. Based on this determination, the magistrate awarded Marty $929.59 a month in spousal support to be paid by Vernon for an indefinite period of time.

{¶26} As previously mentioned, Marty objected to the magistrate's determination of spousal support in the amount of $929.59 and requested the trial court to increase the award of spousal support to $2,169.00 a month, which is the difference between Marty's monthly income of $1,066.77 and her monthly expenses of $3,235.00.

{¶27} The trial court subsequently sustained Marty's objection to the magistrate's decision. However, the trial court ordered Vernon to pay $1,600.00 a month in spousal support, rather than the requested $2,169.00 a month, for an indefinite period of time, thereby increasing the magistrate's spousal support

award by $670.41. In support of its decision to increase Marty's spousal support,

the trial court specifically found:

> **The Court further notes that even though the agreed division of assets of the marriage provides for an equal distribution, there is at least a disparity of Sixty Thousand Dollars ($60,000.00) in intangible, "liquid" assets with the husband receiving the larger share. One Hundred Fifty-One Thousand Dollars ($151,000.00) of the assets provided to [Marty] as her share are in a non-income producing house.**
>
> **This Court has reviewed the evidence and considered the arguments of counsel. This Court is of the opinion that it is fair and reasonable after nearly 50 years of marriage that [Marty] should receive some benefit from the continuing income of [Vernon]. If she would have worked during the marriage, she could have been increasing her retirement benefits. However, because of the history of the marriage [Marty] is necessarily tied to the income stream of [Vernon].**
>
> **This Court finds that [Marty] has monthly income from her share of the Sprint QDRO and Social Security of One Thousand Sixty-Six Dollars and Seventy-Seven Cents ($1,066.77). [Vernon] has monthly income from his share of the Sprint QDRO, his military disability and Social Security of Five Thousand Eighty-Five Dollars and Seventy-Seven Cents ($5,085.77). This Court will factor into [Marty's] share that she can generate some income from her monthly investments, whether from an annuity or otherwise. Taking the testimony from Bruce Dickman that she could receive an annuity investment of One Thousand Two Hundred Thirty-Eight Dollars and Sixty-Four Cents ($1,238.64) per month, the Court will include that in potential income of [Marty].**

(Decision on Objections to Magistrate's Decision, June 17, 2011, pp. 3-4).

{¶28} In its ruling on Marty's award of spousal support, the trial court

referred to specific factors contained in R.C. 3105.18(C)(1) to support its decision.

In particular, the trial court concluded it to be both "fair and reasonable" that Marty "receive some benefit" from Vernon's continuing income stream due to the length of the parties' marriage, the parties' respective roles with regard to earning income during the marriage—which resulted in Marty foregoing earning her own retirement benefits—and the nature of the distribution of the marital assets that each party is to receive in the divorce. *See* R.C. 3105.18(C)(1)(d),(e),(m).

**{¶29}** First, Vernon contends that the manner in which the trial court articulated its reasoning for awarding spousal award in terms of finding that Marty should receive "some benefit from [Vernon's] continuing income" somehow suggests the trial court improperly considered Vernon's future income in calculating the amount of spousal support to award Marty. However, the evidence at trial demonstrates that the majority of Vernon's continuing income is generated from retirement benefits *that he earned while married to Marty*. Revised Code Section 3105.18(C)(1)(a) and (d) specifically permit the trial court consider *all* sources of the parties' income and the parties' retirement benefits. Moreover, R.C. 3105.18(C)(1)(e) and (m) expressly allow the trial court to consider the duration of the parties' marriage and the lost income production capacity of either party that resulted from that party's marital responsibilities. In addition, the statute permits the trial court to consider *any other factor it expressly finds to be relevant and*

*equitable* in its determination of an award of spousal support. *See* R.C. 3105.18(C)(1)(n).

**{¶30}** Second, Vernon maintains that the trial court specifically found that $1,238.64 of potential monthly income derived from an annuity should be "imputed" to Marty. On appeal, Vernon argues that the trial court either failed to "impute," or failed to consider this "imputed income" when it calculated $1,600.00 per month to be the appropriate amount of spousal support awarded to Marty. Vernon contends that this "imputed" income combined with the monthly spousal support award of $1,600.00 per month effectively provides Marty with a higher standard of living than the one she enjoyed while married to Vernon.

**{¶31}** Initially, we note that nowhere in its decision does the trial court use the word "impute."[2] Rather, the trial court indicated that it would consider the fact that Marty could generate *some* monthly income if she invested a portion of the assets she received in the divorce into an annuity or some other income producing

---

[2] In cases involving child support, a trial court may find a party voluntarily underemployed or unemployed and "impute" additional income to the voluntarily underemployed or unemployed party for purposes of determining the appropriate amount of child support. *See* R.C. 3119.01; *Rock v. Cabral*, 67 Ohio St.3d 108 (1993). There is no similar underemployment or unemployment provision appearing in R.C. 3105.18(C)(1). Rather, R.C. 3105.18(C)(1)(b) requires a court to consider "[t]he relative earning abilities of the parties" in determining an appropriate level of spousal support. "When considering the relative earning abilities of the parties in connection with an award of spousal support, Ohio courts do not restrict their inquiry to the amount of money actually earned, but may also hold a person accountable for the amount of money a 'person could have earned if he made the effort.'" *Seaburn v. Seaburn*, Stark App. No.2004CA00343, 2005-Ohio-4722, ¶ 32; citing *Beekman v. Beekman*, Franklin App. No. 90AP-780 (Aug. 15, 1991). Therefore, "Ohio courts often impute income to parties who are voluntarily underemployed or otherwise not working up to their full earning potential." *Id*. at ¶ 33. Thus, there may be certain circumstances in which it is appropriate for a trial court to "impute" income to a party for spousal support purposes. However, the instant case does not present such a circumstance because neither Marty nor Vernon has the current ability to be employed due to their age and poor health. Therefore, neither party is considered voluntarily underemployed or unemployed.

vehicle. Moreover, contrary to Vernon's contentions, it is not clear from its ruling whether the trial court contemplated a specific amount to be considered Marty's potential income from possible future investments. Even with the trial court's spousal support award of $1,600.00 per month, Marty's monthly income still falls short of her monthly expenses by $568.23. Thus, it is apparent that the trial court did attribute *some* potential income to Marty in its spousal support calculation. Furthermore, at the final hearing, Marty testified that receiving a monthly income which allowed her to meet her monthly expenses of $3,235.00 would provide her with the same standard of living she enjoyed while she was married to Vernon. Therefore, we are not persuaded by Vernon's argument that the trial court's award of spousal support permits Marty to live a standard of living in excess of the one she had during the parties' marriage.

{¶32} Third, Vernon argues that the trial court abused its discretion by attempting to equalize the parties' incomes because equalization of incomes is not the goal of a spousal support award. The Supreme Court of Ohio has held that the goal of spousal support is to reach an equitable result, and the method used in attaining that goal cannot be reduced to a mathematical formula. *Kaechele v. Kaechele*, 35 Ohio St.3d 93, 96 (1988) superseded by statute on other grounds as stated in *Heslep v. Heslep*, 7th Dist. No. 825 (June 14, 2000); *Bachtel v. Bachtel*, 7th Dist. No. 03 MA 75, 2004-Ohio-2807, at ¶ 41. Thus, the trial court "must

consider all the factors listed in [R.C. 3105.18(C)(1) ] and not base its determination upon any one of those factors taken in isolation." *Kaechele* at 96.

{¶33} Here, nothing in the record indicates that the trial court's intent was to equalize the parties' incomes or that the trial court focused solely upon the parties' incomes in ordering spousal support. As previously noted, the trial court listed several of the factors in R.C. 3105.18(C)(1) in calculating the amount of spousal support to be awarded to Marty and did not base its determination upon any one of those factors taken in isolation. Moreover, while similar, the parties' incomes are not equal after accounting for the annual spousal support award. Further, although a trial court is not required to equalize incomes, it is not prohibited from doing so where such a result is reasonable and equitable. Thus, even if the trial court intended to equalize the parties' incomes, we cannot find that such a result was inequitable under the circumstances.

{¶34} Finally, we observe that Vernon heavily relies on two decisions from other appellate districts in support of his argument on appeal.

{¶35} In *Seitz v. Seitz*, 2d Dist. Nos. 22426, 23698, 2010-Ohio-3655, the Second Appellate District upheld the determination of the trial court to award *no spousal support* to the wife because each party received over a million dollars in marital assets (in various forms of liquidity), which permitted the wife to earn between $50,000.00 and $70,000.00 per year. *Id*. at ¶ 74. The appellate court

further noted that both parties were in an approximately equivalent financial position in terms of current earned income. *Id.* The appellate court also found persuasive the fact the trial court retained jurisdiction over spousal support and, therefore, could modify the spousal support award if future circumstances warranted such action. *Id.* at ¶ 77.

{¶36} In *O'Grady v. O'Grady*, 11th Dist. No. 2003-T-0001, 2004-Ohio-3504, the Eleventh Appellate District upheld the conclusion of the trial court that the wife *was not entitled to a spousal support award* due to the fact that she was capable of working a full-time job, was likely to receive a widow's pension from her husband, who was fifteen years her senior, and was set to receive significant liquid assets as part of the property division in the divorce. *Id*. at ¶ 83. The trial court determined, and the appellate court agreed, that the *combination* of all these factors did not warrant awarding the wife an award of spousal support. *Id*. at ¶ 84.

{¶37} The facts of the *Seitz* and *O'Grady* cases are inapposite to the facts in the case sub judice. Thus, we find these cases to be unpersuasive in resolving the issues raised by Vernon on appeal. As the evidence in this case establishes, the parties are not in an equivalent position in terms of current earned income and Marty is not receiving a portion of the marital assets with the capability of producing upwards of $70,000.00 in annual income. Moreover, Marty is seventy-years-old, in poor health and not able to be employed. In addition, the appellate

courts in the decisions discussed above were reviewing whether the trial court abused its discretion in *not* awarding spousal support—a determination which is fundamentally different from deciding whether a specific award of spousal support is appropriate and reasonable given the parties' circumstances. Here, both parties conceded that Marty is entitled to some amount of spousal support. Finally, the trial court in this case did not retain jurisdiction over the determination of spousal support. Thus, the award of spousal support cannot be revisited at a later time upon the parties' request.

{¶38} Accordingly, for all the foregoing reasons, we conclude that the decision of the trial court to increase the magistrate's award of spousal support to Marty to $1,600.00 is appropriate and reasonable and, therefore, is not contrary to law nor does it constitute an abuse of discretion. Vernon's first and second assignments of error are overruled.

### *Third Assignment of Error*

{¶39} In his third assignment of error, Vernon claims the trial court erred in addressing Marty's objection to the magistrate's decision. In particular, Vernon maintains that Marty only objected to the duration of the spousal support award and did not specifically object to the amount of the magistrate's spousal support

award. Vernon appears to suggest that the trial court was without authority to consider and rule upon Marty's objection insofar as it concerned the amount of spousal support awarded by the magistrate.

{¶40} First, in reviewing Marty's memorandum in support of her objection to the magistrate's decision, it is apparent that the vast majority of the ten-page document solely challenges the *amount* of spousal support awarded by the magistrate. Thus, we find that Marty's objection was specific and stated with particularity the grounds of her objection and that the trial court did not err in addressing Marty's arguments disputing the amount of spousal support awarded to her in the magistrate's decision. *See* Civ.R. 53(D)(3)(b)(ii).

{¶41} Second, even assuming *arguendo* that Marty did not specifically object to the amount of spousal support in her objections to the magistrate's decision, the issue is now moot. During the trial court proceedings, Vernon filed a response to Marty's objections to the magistrate's decision, in which he argued that Marty was not specific in her objections and that the trial court should not consider her arguments. Notwithstanding Vernon's arguments, the trial court decided to consider Marty's objection to the amount of spousal support awarded by the magistrate and subsequently made a ruling on the matter. Once the trial court decided to hear the objection, the only sanction against Marty for not objecting with specificity is to preclude her from assigning the trial court's

disposition of her objection as error on appeal. *See Wallace v. Willoughby*, 3d Dist. No. 17-10-15, 2011-Ohio-3008, ¶ 21 citing Civ.R. 53(D)(3)(b)(iv). However, Vernon, and not Marty, is the party appealing the judgment of the trial court and, therefore, any argument accusing Marty's objection of lacking specificity is now moot. Vernon's third assignment of error is overruled.

{¶42} Based on the foregoing, the judgment is affirmed.

*Judgment Affirmed*

**PRESTON and ROGERS, J.J., concur.**

**/jlr**