[Cite as *Saks v. Riga*, 2014-Ohio-4930.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 101091**

**JEFFREY W. SAKS**

PLAINTIFF-APPELLANT/
CROSS-APPELLEE

vs.

**LORI BETH RIGA**

DEFENDANT-APPELLEE/
CROSS-APPELLANT

**JUDGMENT:**
AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DR-12-340411

**BEFORE:** E.T. Gallagher, J., E.A. Gallagher, P.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** November 6, 2014

**ATTORNEYS FOR APPELLANT**

Robert P. Ducatman
Tracy K. Stratford
Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114


**ATTORNEY FOR APPELLEE**

Richard D. Messerman
7100 East Pleasant Valley Road
Suite 110
Independence, Ohio 44131

EILEEN T. GALLAGHER, J.:

{¶1} In this divorce action, plaintiff-appellant/cross-appellee, Jeffrey Wayne Saks ("Saks"), and defendant-appellee/cross-appellant, Lori Beth Riga ("Riga"), appeal several orders included in the trial court's divorce decree. We find some merit to the cross-appeal, affirm in part, reverse in part, and remand this case to the trial court for the sole purpose of modifying the spousal support award.

{¶2} The parties were married on September 5, 1993, and have three minor children. During the marriage, both parties went to law school and began their careers as attorneys in New York and New Jersey. They moved to the Cleveland area in 1999 after their first child was born. Saks began his employment with his current employer, Jones Day, in 1999. Riga was employed by the United States District Court, Northern District of Ohio as a habeas attorney from 1999 until 2010 when she took a position in the appellate section of the federal public defender's office. By the end of their marriage, Saks was earning approximately $325,000 as of counsel with Jones Day, and Riga was earning approximately $110,000, after previously earning $117,000 in the federal court.

{¶3} In 2006 and 2007, Saks was nominated for partner at Jones Day. He was not approved to become a partner either time and was instead made Of Counsel. Riga testified that after Saks was not offered partnership, he became increasingly angry. Saks remembered Riga telling him in 2007 that his anger was impacting their relationship. In July 2009, Riga informed Saks that she was not certain that she loved him anymore and that she needed time to "figure things out."

**{¶4}** Despite Saks's efforts to save the marriage, Riga continued to be unhappy and eventually began an extramarital affair. In July 2010, Riga told Saks she wanted a divorce. Saks testified at trial that once it was clear the parties were going to get divorced, he made efforts to come to a quick and amicable resolution. Saks and Riga met several times to discuss finances and how they would divide their marital assets. Saks also voluntarily paid Riga $5,000 for support from April 2011 through December 2011. However, because the parties were unable to agree on a shared parenting plan, Saks filed a complaint for divorce with children in February 2012.

**{¶5}** Prior to trial, a magistrate granted Riga temporary spousal support, effective March 1, 2012. The order required Saks to pay spousal support in the amount of $2,000 per month as well as the mortgage, interest, taxes, and insurance on the marital home. Riga was required to maintain Saks on her health insurance plan during the pendency of the action. The court's order further required Riga to pay for utility expenses, house cleaning, and yard and pool maintenance. However, Saks was required to pay 75 percent of the cost of maintenance expenses in excess of $100, and Riga was required to pay the remaining 25 percent. Saks was ordered to pay the tuition and activity expenses for the minor children at a private school and 60 percent of the children's medical insurance.

**{¶6}** After trial, a magistrate issued an opinion dividing the parties' marital property, and ordered Saks to pay monthly child and spousal support and one-half of Riga's attorney fees. The parties filed timely objections to the magistrate's decision. The trial court overruled all of the objections and adopted the magistrate's decision except for a few limited modifications. Saks now appeals and raises eleven assignments of error. Riga cross-appeals and raises one assigned error.

**De Facto Termination Date**

{¶7} In his first assignment of error, Saks argues the trial court abused its discretion when it determined the de facto termination date of the parties' marriage was December 31, 2012, instead of March 25, 2011, the date the parties separated. He contends the trial court's rationale for selecting the de facto termination date was arbitrary.

{¶8} The date of the final hearing is presumed to be the appropriate termination date of the marriage. *O'Brien v. O'Brien*, 8th Dist. Cuyahoga No. 89615, 2008-Ohio-1098, ¶ 40. However, when a court determines that a de facto termination of the marriage occurred at an earlier time, and that using the date of the final hearing as the termination date would be inequitable, the court may, in its discretion, select a date it considers equitable. *Berish v. Berish*, 69 Ohio St.2d 318, 321, 432 N.E.2d 183 (1982). A trial court generally uses a de facto termination of marriage date only in cases where the parties have separated; have made no attempts to reconcile; and have continually maintained separate residences, separate business activities, and separate bank accounts. *Gullia v. Gullia*, 93 Ohio App.3d 653, 666, 639 N.E.2d 822 (8th Dist.1994). "We have cautioned that a de facto date should not be used unless the 'evidence clearly and bilaterally shows that it is appropriate based upon the totality of the circumstances.'" *Brown v. Brown*, 8th Dist. Cuyahoga No. 100499, 2014-Ohio-2402, ¶ 9, quoting *O'Brien* at ¶ 41. The trial court has broad discretion in choosing the appropriate marriage termination date and this decision should not be disturbed on appeal absent an abuse of that discretion. *Berish v. Berish*, 69 Ohio St.2d 318 at 321, 432 N.E.2d 183.

{¶9} Saks contends that because the parties separated on March 25, 2011, with intent to divorce, and continually maintained separate residences and bank accounts, the court should have used that date as the de facto termination of marriage date. He further argues the court's

rationale, that it did not have reliable evidence as to value of the parties' assets on March 25, 2011, is unreasonable.

{¶10} That the parties were separated, made no effort to reconcile, and maintained separate bank accounts, weighs in favor of an earlier de facto termination date. However, the presence or absence of reliable data concerning the value of the parties' assets is probably the most significant factor the court must consider when selecting a de facto termination date. Thus, it would have been unreasonable for the court to select an earlier date if the necessary information to make an equitable distribution was not available at that time.

{¶11} Saks asserts there was evidence of asset values as of March 25, 2011, and cites (1) his own testimony, (2) Riga's affidavit of asset and debt values, (3) plaintiff's four expert reports, and (4) the testimony of three experts. However, none of this evidence supports Saks's assertion. Plaintiff's expert reports include (1) an appraisal of the marital home dated August 23, 2012, (2) a preliminary report from an economist concerning the value of Riga's pension benefits as of August 15, 2012, (3) a revised pension valuation of Riga's pension benefits as of January 23, 2013, and (4) an appraisal of the parties' personal property dated December 29, 2012.

{¶12} The appraiser who valued the parties' marital home testified at trial and confirmed that he performed an appraisal of the parties' marital home in August 2012. (Tr. 201.) The economist testified that he valued Riga's pension benefits and generated a report on August 15, 2012. (Tr. 440.) Pamela Morse, who appraised the parties' personal property, testified at trial on January 31, 2013, and offered an opinion on the value of the parties' personal property according to "today's market." (Tr. 482.)

**{¶13}** Despite Saks's statements to the contrary, the record contains only evidence of asset valuations as of the later half of 2012 and January 2013. Furthermore, Saks fails to demonstrate that he was prejudiced by the date the court selected.

**{¶14}** Accordingly, the first assignment of error is overruled.

### Valuation of Assets

**{¶15}** In the second assignment of error, Saks argues the trial court erred in valuing the parties' assets and that the erroneous valuations resulted in an inequitable division of marital property. He contends the trial court (1) failed to value all the marital assets, (2) valued assets with inconsistent dates or with no valuation date, and (3) valued assets after the de facto termination date.

**{¶16}** R.C. 3105.171 directs a trial court to equitably divide the parties' marital property. A trial court should generally apply the same set of dates when valuing marital property. *Kramer v. Kramer*, 8th Dist. Cuyahoga No. 74166, 1999 Ohio App. LEXIS 3491 (July 29, 1999). However, if the circumstances require the court to use different dates for valuation purposes, the court need not utilize the same valuation date for each item of marital property. *Cangemi v. Cangemi*, 8th Dist. Cuyahoga No. 86670, 2006-Ohio-2879, ¶ 23. If the court uses different dates to value certain marital assets, it must adequately explain its reasons for doing so. *Kramer* at *7; *Budd v. Budd*, 9th Dist. Summit No. 24485, 2009-Ohio-2674, ¶ 12. Otherwise, the valuations are based on the value of each asset as of the marriage termination date. The trial court's valuation of marital assets will not be disturbed absent an abuse of discretion. *Berish v. Berish*, 69 Ohio St.2d 318 at 319, 432 N.E.2d 183.

**{¶17}** Saks contends the trial court failed to value a Federal Credit Union savings account and two Gift of Israel accounts that were in Riga's name. The trial court did not value these

accounts because there was no evidence upon which the court could make an evaluation. In Saks's objections to the magistrate's decision, he asserted that Riga should be held accountable for her concealment of these marital assets, despite his admission that he knew about the existence of these accounts for "four months." Saks has not identified anywhere in the record where he sought court intervention to obtain evidence of these accounts. He never filed a written motion to show cause, and Saks has not directed this court to anywhere in the trial transcript where these issues were raised at trial. Instead, he refers to his objections to the magistrate's report wherein he submitted an affidavit attesting to the existence of these accounts.

{¶18} When ruling on a party's objections to the magistrate's decision, Civ.R. 53(D)(4)(d) permits the trial court to "hear additional evidence but may refuse to do so unless the objecting party demonstrates that the party could not, with reasonable diligence, have produced that evidence for consideration by the magistrate." In his objections to the magistrate's decision, Saks states that he was aware of this alleged concealment for four months. Therefore, because he could have obtained this evidence with reasonable diligence before trial, he has waived any valuation issues related to these accounts on appeal. *Niskanen v. Giant Eagle, Inc.*, 122 Ohio St.3d 486, 2009-Ohio-3626, 912 N.E.2d 595, ¶ 34 (A party who fails to raise an argument before the trial court waives the right to make that argument on appeal).

{¶19} Saks further contends the trial court failed to provide the correct value of Riga's Federal Employee Retirement System ("FERS") account. This assertion is not supported by the record. At trial, Saks's economist, Dr. Harvey Rosen ("Dr. Rosen") valued Riga's FERS pension plan at $915,851, assuming she continued working for the federal government until retirement age, i.e., for the next 17 years. However, this court has previously held that a trial court may not assume that an employee-spouse would continue working for years into the future

when valuing that spouse's pension. *Potts v. Potts*, 8th Dist. Cuyahoga No. 66729, 1994 Ohio App. LEXIS 5514 (Dec. 8, 1994).

{¶20} Riga's expert, Brian Hogan ("Hogan") testified that the value of Riga's FERS plan was $177,911.96 as of November 5, 2012. In dividing Riga's pension, the court ordered that Riga's FERS account "be divided equally between the parties pursuant to the coverture fraction as of December 31, 2012 by Order Acceptable for Processing." The "coverture fraction" refers to a formula used to equitably divide a defined benefit plan that has not yet matured. *Daniel v. Daniel*, 139 Ohio St.3d 275, 2014-Ohio-1161, 11 N.E.3d 1119, ¶ 14-15. The formula divides the number of years of creditable service during the marriage (the numerator) by the total number of years of creditable service at the time the employee would retire (the denominator). *Id*. at ¶ 15, quoting *Thompson v. Thompson*, 196 Ohio App.3d 764, 2011-Ohio-6286, 965 N.E.2d 377, ¶ 33 (4th Dist.). "Once a pension member retires, the defined benefit plan administrator multiplies the monthly accrued benefit by the coverture fraction." *Thompson* at ¶ 33, citing *Long v. Long*, 176 Ohio App.3d 621, 2008-Ohio-3006, 893 N.E.2d 217, ¶ 60, fn. 6. The resulting sum is the marital portion of the pension benefit. The Ohio Supreme Court has held that use of the coverture fraction to divide unmatured pension benefits is "a reasonable method of achieving equity." *Daniel* at ¶ 14. Therefore, the trial court properly adopted this method when it valued Riga's FERS pension.

{¶21} It is true, as Saks argues, that the trial court failed to provide a value for Riga's 42 shares of Prudential stock. However, the court ordered the shares to be divided "equally between the parties." Although the value of the shares likely fluctuated from day to day, Saks fails to show how the division was inequitable or prejudicial. No matter how the value of each individual share changed, the number of shares was equally divisible and remained unchanged.

{¶22} The court determined Riga's Universal life insurance policy had a cash value of $2,064.52, according to the value she provided in her pretrial affidavit dated April 19, 2012, which Saks offered into evidence as plaintiff's exhibit No. 10. There is no other evidence in the record disputing this figure, nor is there any other evidence that the value changed before the de facto termination of the marriage date. Similarly, the court determined Saks's Universal life insurance policy had a cash value of $7,237.19, according to his pretrial statement and affidavit dated August 20, 2012, which Riga offered into evidence as defendant's exhibit No. 4. Again, there is no other evidence showing that the value of Saks's policy changed before the de facto termination-of-marriage date.

{¶23} In the divorce decree, the court ordered Saks to pay Riga the sum of $2,586.33 to equalize the cash value of the two life insurance policies. The court explained that the combined value of the parties' life insurance policies was $9,301.71, half of which is $4,650.85. $4,650.85 less the value of Riga's policy ($2,064) equals the $2,586.33 the court ordered Saks to pay Riga. Therefore, the valuation and distribution of the parties' life insurance policies was equitable.

{¶24} Saks argues the trial court failed to identify the date used to value the parties' AXA investment account. However, there was no reliable and definitive value of that account identified in the evidence as of the termination-of-marriage date. Therefore, the court ordered Saks's counsel "to contact AXA and prepare the appropriate document or order in order to divide the AXA Investment account equally between the parties" within 30 days of the final judgment. Without reliable evidence with which to make an equitable division, the trial court reasonably ordered the division within a certain time, as soon as possible after the divorce. This was not an

abuse of discretion under these circumstances, and Saks fails to demonstrate that he was prejudiced by this order.

**{¶25}** Saks further asserts that the trial court failed to identify the date it used to value Riga's car loan balance. He also claims the court used inconsistent dates to value the parties' respective cars and that the inconsistent valuation dates artificially decreased the value of Riga's car and the corresponding equalization payment she owed to Saks.

**{¶26}** Riga averred in her pretrial affidavit that her Buick Enclave had a loan balance of $13,659. Saks stated in his affidavit dated August 20, 2012, that the balance was $12,500, which was consistent with his trial testimony. (Tr. 256, 257.) They both averred the car was worth $30,704 in their pretrial affidavits. Riga testified at trial that she looked up the vehicle's value in the "Blue Book" and online when she listed its value in her affidavit. She further testified that she believed its value had depreciated since she signed her April 2012 affidavit. Based on Riga's testimony, the court found the Enclave was worth $25,000 at the time of trial. This is the only evidence introduced at trial upon which the court could determine the vehicle's value. Saks did not provide any evidence of a greater value.

**{¶27}** Similarly, Saks averred in his pretrial affidavit that the parties' home mortgage had a balance of $200,000 in August 2012. The trial court determined that as of the termination of marriage date, the mortgage balance was $198,000. There is no evidence to dispute this valuation. We therefore cannot say that the trial court erred in this valuation.

**{¶28}** After reviewing the evidence and the trial court's determination as to the value of the parties' assets, we conclude that the trial court made an equitable distribution of the marital assets and there was no abuse of discretion.

**{¶29}** Accordingly, the second assignment of error is overruled.

## Parties' Car Values

{¶30} In the third assignment of error, Saks argues the trial court abused its discretion in valuing the parties' cars because there was no competent evidence to support the values attributed to Riga's car and loan balance. He also contends that because the court used inconsistent valuation dates, the court awarded Riga a $4,500 windfall.

{¶31} Prior to trial, both Saks and Riga averred in their respective pretrial statement affidavits that Riga's Buick Enclave was worth $30,704. Riga testified at trial that the current value of the Enclave at trial was $25,000. Saks contends this valuation was not reliable because Riga does not "have a head for finances," and because she provided no basis for the value she placed on the car. However, when Riga's lawyer attempted to lay a foundation for her knowledge of the vehicle's value, the court acknowledged that she had recently researched the value of the vehicle online. (Tr. 751.) Saks never offered any different evidence regarding the Enclave's value and there was no evidence to refute Riga's testimony. Therefore, the court reasonably accepted Riga's current valuation of the Enclave.

{¶32} Saks further argues it was unfair to assign a depreciated value to Riga's Enclave without assigning a depreciated value to his Buick LaCrosse. However, neither party offered any evidence regarding the LaCrosse's value at trial. Evidence of the vehicle's most current value came from Saks's affidavit dated August 20, 2012, because Saks did not provide the court with a depreciated value as of the time of trial. Saks cannot claim prejudice from his own failure to provide evidence of his car's depreciated value.

{¶33} The third assignment of error is overruled.

## Separate Property

{¶34} In the fourth assignment of error, Saks argues the trial court erred as a matter of law when it concluded certain items were separate rather than marital property. Saks takes issue with 11 items of property, totaling $1,115 in value, that were gifts given to either Saks or Riga during the marriage. He also contends the children's bedroom furniture in Riga's possession should not have been excluded as separate property.

{¶35} A party asserting that an asset is separate property has the burden of proving that claim by a preponderance of the evidence. *Rossi v. Rossi*, 8th Dist. Cuyahoga Nos. 100133 and 100144, 2014-Ohio-1832, ¶ 43. A trial court's characterization of property as marital or separate property is a mixed question of law and fact and will not be reversed unless it is against the manifest weight of the evidence. *Williams v. Williams*, 8th Dist. Cuyahoga No. 95346, 2011-Ohio-939, ¶ 8. An appellate court will not disturb the trial court's distribution of separate property absent an abuse of discretion. *Id.*

{¶36} Marital property includes "[a]ll real and personal property that currently is owned by either or both of the spouses * * * and that was acquired by either or both of the spouses during the marriage." R.C. 3105.171(A)(3)(a)(i). R.C. 3105.171(A)(6)(a) defines "separate property," in relevant part as "[a]n inheritance by one spouse by bequest, devise, or descent during the course of the marriage," and "[a]ny gift of any real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse." R.C. 3105.171(A)(6)(a)(i) and (vii).

{¶37} Pamela Morse, an estate liquidator, testified that when she appraised the parties' personal property, Riga identified several items that were gifts from family relatives and Morse made a note of these gifts in her original report. (Tr. 486.) Saks contends these items were

given to them as a couple, not each of them individually by their own relatives. However, at trial, Riga identified items of separate property listed in Morse's report as gifts she received from her relatives and gifts Saks received from his relatives. Saks's lawyers never questioned Riga on cross-examination as to whether or not these items were intended as gifts to both parties. Nor did Saks provide any evidence contradicting Riga's testimony that they were separate property. Therefore, there was clear and convincing evidence regarding the separate property of both parties, and we cannot say the court's characterization of the parties' separate property was against the manifest weight of the evidence or an abuse of discretion.

{¶38} Further, the court did not award the children's bedroom furniture to Riga as separate property. Rather, the court concluded that the children's bedroom furniture belonged to neither Riga nor Saks; it was the children's property and therefore not subject to division.

{¶39} Accordingly, the fourth assignment of error is overruled.

**Whole Life Insurance Policies**

{¶40} In the fifth assignment of error, Saks argues the trial court abused its discretion in valuing the parties' whole life insurance policies because it used different dates and valuation methods. He contends Riga received a windfall as a result of this error.

{¶41} Saks asserts the trial court valued Riga's policy as of April 2012 using the cash surrender value, but valued Saks's policy as of August 2012 using the total cash value. He contends that because whole life insurance policies appreciate over time, Riga's earlier valuation date deprived Saks of four months of appreciation on her policy. However, the trial court's valuations of the respective policies were based on information provided in the parties' pretrial affidavits. In Saks's affidavit, he averred that his whole life insurance policy had a cash surrender value of $7,237.19. At trial he testified he received this value from his insurance

broker. When asked what the cash value of the policy was on the day of trial, Saks replied that he did not know the cash surrender value at that time. (Tr. 260.)

**{¶42}** Without additional evidence identifying the present cash surrender value of Saks's policy at the time of trial, the trial court could only use the value identified in Saks's affidavit since it was the only credible evidence on the subject. Therefore, despite Saks's argument to the contrary, the court utilized the same valuation method to value both policies, i.e., the cash surrender value. Further, the court had no other evidence upon which to value Riga's policy after April 2012. Therefore, the court had no choice but to value the policies according to the only evidence in the record.

**{¶43}** Moreover, the trial court did not order liquidation of the policies because it intended to preserve these assets for the benefit of the parties' minor children. The court concluded that the combined values of the two policies was $9,301.71 and that half that amount was $4,650.85. To offset the difference in the policies, the court ordered Saks to pay Riga the sum of $2,586.33 to equalize the cash value of the two policies. This order provided the most equitable division of life insurance policies that was possible based upon the evidence in the record and therefore was not an abuse of discretion.

**{¶44}** The fifth assignment of error is overruled.

### Coverture Fraction Valuation Method

**{¶45}** In the sixth assignment of error, Saks argues the trial court erred in holding that Ohio law precludes pension valuation using the coverture method offered by Saks's expert, Dr. Harvey S. Rosen ("Dr. Rosen"). He also contends the trial court abused its discretion when it concluded that dividing Riga's pension by an order acceptable for processing would not financially entangle the parties.

**{¶46}** In evaluating Riga's FERS pension, Dr. Rosen testified that he calculated the value Riga could expect to receive when she retires at age 62. He admitted that to calculate this value, he assumed she would continue to work an additional 16 to 17 years. Dr. Rosen also assumed that Riga would continue to receive an annual 3 percent cost of living increase until she retires. Based on these assumptions, Dr. Rosen determined what the pension would be worth in 2029. Dr. Rosen admitted he was not familiar with qualified domestic relations orders or order acceptable for processing.

**{¶47}** By contrast, Riga's expert, Brian Hogan ("Hogan"), testified that he uses the Pension Benefit Guaranty Corporation ("PBGC") method for valuing FERS pensions because the PBGC is the government entity that ensures plans are properly funded and can pay their benefits. He further testified that the PBGC method is widely used in the industry.

**{¶48}** In preparing his evaluation, he assumed Riga performed no additional work for the federal government after June 29, 2012, and assumed a retirement age of 62 years. An individual who has a minimum five years of service in the FERS plan becomes eligible for retirement benefits at 62 years of age. After factoring in the PBGC interest rates and the PBGC mortality tables, Hogan determined that Riga's FERS pension had a present value of $177,911.96, as of November 12, 2012, because it had vested but was not matured. This figure also represented the marital portion of the pension earned during the marriage.

**{¶49}** Hogan explained that unmatured pensions are typically divided using a deferred distribution method, known as the coverture formula or proportionate share method, and that the actual division is completed through a court order. According to Hogan, the coverture formula is 50 percent times a fraction, the numerator of which is the number of years of service earned

during the marriage and the denominator of which is the total number of years that the participant has earned at the time of retirement.

**{¶50}** Hogan testified that the coverture fraction is a well-recognized method of dividing pensions in Ohio and that an order acceptable for processing would be appropriate for an FERS pension. According to Hogan, an order acceptable for processing would take into consideration any changes in the plan that took place after the parties' divorce. Any change that occurred to the plan prior to retirement would be reflected in the court order acceptable for processing.

**{¶51}** In discussing Dr. Rosen's report, Hogan testified that Rosen's report assumed that (1) Riga would continue to work until retirement age, and (2) Riga would receive steady pay increases until she retires. Hogan explained that he does not assume that an individual will continue working into the future and does not assume the individual will receive steady pay increases because he does not know whether an individual will continue working, much less whether the individual's salary will increase at any specific rate.

**{¶52}** As previously stated, the Ohio Supreme Court has held that the coverture formula Hogan used to divide unmatured pension benefits is "a reasonable method of achieving equity." *Daniel v. Daniel*, 139 Ohio St.3d 275, 2014-Ohio-1161, 11 N.E.3d 1119, ¶ 14-15. In *Potts v. Potts*, 8th Dist. Cuyahoga No. 66729, 1994 Ohio App. LEXIS 5514 (Dec. 8, 1994), this court held that a trial court should not assume that an employee participating in a defined benefit plan will continue working into the future because "[s]uch an assumption places an unfair burden" on the employee-spouse. *Id*. at * 10. Therefore, the trial court properly adopted Hogan's valuation method when it valued Riga's FERS pension.

**{¶53}** Saks asserts that an order acceptable for processing unfairly entangles the parties' interests. He contends there are a number of scenarios that could delay Saks's right to collect

his portion of the benefit or lead to forfeiture of his portion altogether. For example, Saks argues that if Riga elects to receive a lump sum refund of her contributions, he would be entitled to nothing. If Riga decides not to retire until age 70, he would be forced to wait until she retires to begin receiving his interest.

{¶54} Undoubtedly, "when a trial court decides that a pension asset shall be paid by deferred distribution, it has created a situation where the parties' affairs are not concluded." *Hoyt v. Hoyt*, 53 Ohio St.3d 177, 182, 559 N.E.2d 1292 (1990). However, the Ohio Supreme Court has recognized that dividing a pension by way of a qualified domestic-relations order "divides the risk between the parties that the benefits will fail to vest or mature." *Daniel* at ¶ 13, quoting *Hoyt* at 182. Further, the qualified domestic-relations order notifies the plan administrator of the non-employee spouse's interest in the pension and thereby protects that interest. *Trustees of the Dirs. Guild of Am.-Producer Pension Benefits Plans v. Tise*, 234 F.3d 415 (9th Cir.2000). Once an acceptable order for processing has been forwarded to the FERS program and approved, Saks's interest in Riga's FERS plan is protected.

{¶55} Thus, if Riga were to request a lump sum payment, Saks would receive his proportionate share of the payment. Of course, both parties would likely pay more taxes on a lump sum payment than on monthly distributions at retirement age. But since Riga would suffer the same tax consequences as Saks on a lump sum payment, the tax consequences would have a deterrent effect on any desire she may have to obtain a lump sum. The qualified domestic-relations order preserves the asset so that each party can procure the most benefit. The court's use of the qualified domestic-relations order achieves an equitable result and is therefore not an abuse of discretion.

{¶56} The sixth assignment of error is overruled.

## 2011 Tax Refund

{¶57} In the seventh assignment of error, Saks argues the trial court erred by refusing to enforce an agreement to equally share the collective proceeds of the parties' 2011 tax refund.

{¶58} In 2012, the parties, through their attorneys, agreed they would file their taxes in a manner that would maximize their collective refund and that they would split the refund equally. In consideration of this agreement, Saks gave Riga permission to file her tax return as a head of household, claiming two of the parties' three children as dependents. As a result, Riga obtained an $11,000 tax refund, and Saks received a $5,000 refund. Because the collective refund was $16,000, and Saks received $5,000, Saks was entitled to an additional $3,000 to equalize the refund.

{¶59} Riga concedes Saks was entitled to approximately $3,000 from the tax refund. However, Riga was not required to pay Saks $3,000 in cash because he recouped that amount when he stopped paying Riga support payments. Indeed, the magistrate explained in his decision:

> The magistrate finds that throughout the course of the trial, the Plaintiff referred to the fact that he was owed by the Defendant the sum of approximately Three Thousand Dollars ($3,000) as a result of filing the parties' 2011 Individual Tax Return as prepared by Plaintiff's mother. The Magistrate specifically rejects that claim based upon the Plaintiff's own testimony that he stopped providing any support for the Defendant and the minor children in December 2011, in part because he knew that the Defendant would be receiving an Eleven Thousand Dollar ($11,000) Federal tax refund. Therefore, although he was able to bank his share of the refund received on his 2011 Federal tax return, the Defendant was required to expend her share in order to support herself and the parties' minor children.

{¶60} In addition, the evidence showed that Riga paid the mortgage on the marital residence for the months of March, April, May, and June 2012 as well as an escrow shortage, for a total of $8,690.69. Saks never reimbursed Riga for those mortgage payments as required by

the court's temporary support order. Saks also failed to reimburse Riga for the automobile insurance as required by the temporary support order. Thus, the magistrate's decision not to order Riga to pay Saks his share of 2011 tax refund was not arbitrary or unreasonable in light of the facts and circumstances of this case.

{¶61} Therefore, the seventh assignment of error is overruled.

## Spousal Support

{¶62} In the eighth assignment of error, Saks argues the trial court abused its discretion by awarding Riga spousal support. He contends the court's reasons for awarding spousal support are not sustained by the manifest weight of the evidence.

{¶63} When awarding spousal support, the "trial court is provided with broad discretion in deciding what is equitable upon the facts and circumstances of each case." *Kunkle v. Kunkle*, 51 Ohio St.3d 64, 67, 554 N.E.2d 83 (1990). Thus, a spousal support decision is generally left to a trial court's discretion, subject to the statutory factors set forth in R.C. 3105.18(C). R.C. 3105.18(C) states:

> (1) In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:
>
> (a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
>
> (b) The relative earning abilities of the parties;
>
> (c) The ages and the physical, mental, and emotional conditions of the parties;
>
> (d) The retirement benefits of the parties;
>
> (e) The duration of the marriage;

(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

(g) The standard of living of the parties established during the marriage;

(h) The relative extent of education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

(2) In determining whether spousal support is reasonable and in determining the amount and terms of payment of spousal support, each party shall be considered to have contributed equally to the production of marital income.

**{¶64}** Nothing in those factors prohibits a trial court from attempting to equalize the parties' income. *Kedanis v. Kedanis*, 12th Dist. Butler No. 2012-01-015, 2012-Ohio-3533, ¶ 15, quoting *Arthur v. Arthur,* 3d Dist. Shelby No. 17-11-28, 2012-Ohio-1893, ¶ 33 ("'[A]lthough a trial court is not required to equalize incomes, it is not prohibited from doing so where such a result is reasonable and equitable.'") Thus, the trial court "must consider all the factors listed in R.C. 3105.18(C)(1) and not base its determination upon any one of those factors taken in

isolation." *Kaechele v. Kaechele*, 35 Ohio St.3d 93, 96, 518 N.E.2d 1197 (1988). Indeed, "some of the factors enumerated in R.C. 3105.18(B) are more pertinent than others in the process of reaching an equitable property division, while some are more relevant in ascertaining the need for and amount of sustenance alimony." *Id.*

{¶65} A trial court is not required to enumerate each factor in R.C. 3105.18(C)(1), but must provide a sufficient basis to support its award. *Kapadia v. Kapadia*, 8th Dist. Cuyahoga No. 94456, 2011-Ohio-2255, ¶ 87, citing *Abram v. Abram*, 9th Dist. Medina No. 3233-M, 2002 Ohio App. LEXIS 33 (Jan. 9, 2000). We will not reverse the trial court's spousal support decision absent an abuse of discretion. *Bechtol v. Bechtol*, 49 Ohio St.3d 21, 24, 550 N.E.2d 178 (1990).

{¶66} In analyzing these statutory factors, the magistrate found that the parties were married for 20 years, even though the evidence established their marriage lasted approximately 18 and one-half years as of the de facto termination of the marriage date. Saks contends that because the court's finding was against the manifest weight of the evidence, the court should not have awarded spousal support. However, the duration of the marriage is only one of many factors the court must consider when making a spousal support decision.

{¶67} The trial court further found that both parties were attorneys employed on a full time basis. Saks was employed as Of Counsel with Jones Day as a civil litigator, earning $325,000 per year. Riga's annual income as a federal public defender was $110,000, but her salary was temporarily reduced by 20% as a result of a sequester, and at the time of trial her income was $88,000. Saks argues the court erred in finding that Riga's income was only $88,000. However, the evidence showed that at the time of trial, Riga was furloughed one day

per week and was collecting only 80% of her annual salary. At that time, the duration of the federal sequester was unknown.

**{¶68}** Moreover, this finding of fact had no impact on the magistrate's spousal support analysis as evidenced by magistrate's exhibit No. "1" attached to the magistrate's decision. In this exhibit, which is a single page child support computation worksheet dated September 27, 2013, the magistrate calculated child support using Riga's income of $110,000 per year, not the temporary salary of $88,000 per year. Therefore, the magistrate contemplated the fact that the sequester was temporary and would most likely be short lived.

**{¶69}** The court also found that both parties contributed to the other's acquisition of education, training, and earning ability. Although Saks disputes this fact, the testimony at trial established that both parties attended law school during the marriage. Saks supported Riga during her first year of law school by waiting tables at a local restaurant, and Riga's educational loans assisted in paying the parties' rent. Riga's income as a law clerk with a state court helped pay the bills while Saks completed his third year of law school and worked part-time at a New York law firm.

**{¶70}** Saks argues the trial court's finding that a spousal support award of $3,500 per month will provide Saks with a larger amount of disposal income than under the magistrate's order was erroneous. He contends the magistrate's decision assumed that Riga would continue to live in the marital residence and would be required to pay the mortgage instead of Saks. Saks further argues that since the trial court gave Saks the right to purchase the home in the divorce decree, the magistrate's reasoning was based on a false assumption.

**{¶71}** However, the magistrate's decision contemplated Saks purchasing the home and relieving Riga of the mortgage obligation. The magistrate's decision states, in relevant part:

The Magistrate finds, based upon the testimony of the appraisers and the parties, that plaintiff shall have the right to buy out the defendant's interest in the marital residence for one half (½) the net equity based upon a purchase price of Three Hundred Fifteen Thousand Dollars ($315,000.00) less the current outstanding mortgage balance of approximately One Hundred Ninety-Eight Thousand Dollars ($198,000). He shall exercise that right within (60) days of decree of divorce by written notice to the defendant and her counsel. The Magistrate further finds that the defendant shall vacate the residence in the event that the plaintiff exercises that right within ninety (90) days of the closing of the transaction and funds being transferred to the defendant. * * *

In the event that the plaintiff does not elect to purchase the property, then the defendant shall have the right to remain in the property until the parties' middle child, Andrew, graduates from Agnon School in approximately two (2) years, at which time the property shall be promptly listed for sale. The purpose of not listing the property for sale immediately is to provide stability for the minor children. * * *

The Magistrate further finds that during the period of time the defendant continues to reside in the marital residence, she shall be solely responsible for the mortgage, taxes, insurance and utilities associated with the residence.

{¶72} Therefore, despite Saks's argument to the contrary, the magistrate's spousal support recommendation took into account the fact that Saks may purchase the home and assume responsibility to pay the mortgage. It is worth noting that the magistrate recommended Riga receive $5,000 per month in support and the trial court reduced the award to $3,500.

{¶73} Saks argues the magistrate's finding that Riga's income and earning capacity were reduced by her marital responsibilities was against the manifest weight of the evidence. He contends that because Riga did not immediately find work as an attorney after completing a one-year clerkship the year after law school, she was incapable of obtaining employment outside the government. However, Riga testified that she maintained her employment as a habeas attorney in the federal district court because it was "family friendly." Indeed, Riga worked from home every Friday from 2001 through 2010, when she took a position in the federal public defender's office.

**{¶74}** Riga further testified that because Saks's responsibilities at Jones Day were demanding, she assumed the primary responsibility of caring for the children. Although she may have considered private practice at times, there was competent, credible evidence that she made a decision to keep work that was flexible for the family's sake. Therefore, the magistrate's conclusion that Riga's earning capacity was reduced by her marital responsibilities is a significant factor that is sustained by the weight of the evidence.

**{¶75}** Saks argues the trial court's finding that Saks lived with another person since May 2011 was contradicted by the magistrate's findings of fact. It is true that while the divorce decree states that Saks has "lived with another person since May 2011," the magistrate's decision states that Saks began dating his fiancée, Renee Vining ("Vining"), on May 31, 2011. Thus, the divorce decree misstates a fact. According to the transcript, Saks moved in with Vining in August 2012. Thus, when the court issued the divorce decree in February 2014, Saks had been living with Vining for almost a year and a half. Furthermore, the evidence showed that Saks and Vining were engaged to be married. Vining is a licensed attorney in private practice. Saks testified that at the time of trial, Vining was contributing $1,000 per month toward his new family's rent and also procured some groceries. Therefore, for purposes of awarding spousal support to Riga for the next 60 months, Vining's actual contributions to Saks's new family carry significantly more weight than the exact date they began living together.

**{¶76}** Finally, the trial court found that Riga began her extramarital affairs with two different men in late summer or early fall of 2010, after she advised Saks that she wanted a divorce. Saks contends this finding is contradicted by magistrate's findings of fact. However, even if this fact is contradicted by the magistrate's finding, the fact is irrelevant to the spousal support analysis for the reasons explained in our discussion of the ninth assignment of error.

{¶77} When considering the statutory factors set forth in R.C. 3105.18(C) in relation to the facts of this case, we cannot say the trial court abused its discretion when it awarded Riga $3,500 per month in spousal support. As previously stated, the purpose of spousal support is to achieve equity, and some of the statutory factors carry more weight in the spousal support analysis than others. R.C. 3105.18 does not require a spousal support award to provide the parties with an equal standard of living. However, R.C. 3105.18(C)(1)(g) specifically directs trial courts to consider the "standard of living of the parties established during the marriage." Furthermore, "equity requires that a disadvantaged spouse receive sufficient spousal support to bring him or her up to a reasonable standard of living in light of the standard maintained during the marriage." *Howell v. Howell*, 2d Dist. Clark No. 2002 CA 60, 2003-Ohio-4842, ¶ 25.

{¶78} Given the large discrepancy in the parties' income, coupled with the fact that Riga pursued a less lucrative career because it provided her the flexibility she needed to care for the children, a spousal support award was equitable. The trial court reduced the award from $5,000 a month to $3,500. Furthermore, the court only awarded spousal support for 60 months, or until Riga remarries, whichever occurs first.

{¶79} Therefore, the eighth assignment of error is overruled.

**Marital Misconduct**

{¶80} In the ninth assignment of error, Saks argues the magistrate erred as a matter of law in holding that Ohio law precludes courts from considering marital misconduct when determining an award of spousal support.

{¶81} R.C. 3105.18(C)(1) does not include marital misconduct as a factor the court must consider in the spousal support analysis. Saks nevertheless contends the court should have considered Riga's extramarital affairs because R.C. 3105.18(C)(1)(m) permits the court to

consider "[a]ny other factor that the court expressly finds to be relevant and equitable." Indeed, the Ohio Supreme Court has held that although R.C. 3105.18 does not list marital misconduct, it may be a relevant factor in a court's determination where appropriate. *Zimmie v. Zimmie*, 11 Ohio St.3d 94, 96, 464 N.E.2d 142 (1984). However, in *Zimmie*, the court upheld the trial court's decision to exclude evidence of marital misconduct under the facts of that case. *Id*.

{¶82} In rejecting Saks's contention that Riga's extramarital affairs should affect Riga's spousal support award, the court reasoned that Riga did not engage in any financial misconduct, and her relationships did not create any kind of financial hardship on the parties. The court noted, in fact, that Saks did not even attempt to prove any economic loss as a result of Riga's extramarital relationships. Although Saks contends Riga's extramarital relationships affected her decision to end the marriage, Riga testified that her relationship with Saks was damaged as a result of Saks's behavior long before she began any extramarital affair. Under these circumstances, the trial court properly rejected this evidence from its spousal support analysis.

{¶83} The ninth assignment of error is overruled.

### Spousal Support Commencement Date

{¶84} In the tenth assignment of error, Saks argues the trial court abused its discretion by failing to calculate spousal support as of March 11, 2011. As previously stated, Saks asserts the court should have used March 11, 2011, Saks's proposed de facto marriage termination date. He contends that by ordering 60 months of spousal support beginning on March 1, 2014, the court discounted the three years of spousal support Riga received from the date they separated, March 25, 2011, to the effective date of the divorce decree. Saks further asserts that the trial court's judgment unfairly rewards Riga for her intentional delay in resolving the case.

**{¶85}** Permanent spousal support is the support awarded after the court determines the division or disbursement of property under R.C. 3105.171. R.C. 3105.18(B); *Greenwood v. Greenwood*, 6th Dist. Lucas No. L-12-1094, 2013-Ohio-5339. Temporary spousal support is the support awarded during the pendency of any divorce proceeding. *Id.* Courts are not required to order the commencement of spousal support as of the termination of the marriage date. *See Patterson v. Patterson*, 4th Dist. Adams No. 97CA654, 1998 Ohio App. LEXIS 6332 (Dec. 14, 1998). Indeed, Civ.R. 75(J) allows parties to invoke the continuing jurisdiction of the court to modify spousal support orders after journalization of the divorce decree.

**{¶86}** There is no indication that the court disregarded any support payments Saks was obligated to pay during the pendency of the proceedings when it made its award of permanent spousal support. As previously stated, the aim of any spousal support award is equity. *Kaechele*, 35 Ohio St.3d 93, 96, 518 N.E.2d 1197. The trial court considered all the factors required by R.C. 3105.18(C)(1) and made an equitable spousal support award in both duration and amount based on those factors. Therefore, since the spousal support award was equitable under the circumstances of this case, the actual date upon which the spousal support order commenced was of no consequence.

**{¶87}** The tenth assignment of error is overruled.

### Attorney Fees

**{¶88}** In the eleventh assignment of error, Saks argues the trial court abused its discretion in awarding Riga attorney fees. He contends the court's basis for the attorney fee award, i.e., Riga's inability to pay, was not justified because the court equalized the parties' incomes.

**{¶89}** Pursuant to R.C. 3105.73(A), a domestic relations court "may award all or part of reasonable attorney's fees * * * to either party if the court finds the award equitable." In

determining whether an award of fees is equitable, the court may consider "the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate." R.C. 3105.73(A); *Walpole v. Walpole*, 8th Dist. Cuyahoga No. 99231, 2013-Ohio-3529, ¶ 33. "An award of attorney fees under R.C. 3105.73 lies within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion." *Rand v. Rand*, 18 Ohio St.3d 356, 359, 481 N.E.2d 609 (1985).

**{¶90}** Saks contends the court's finding that Riga was unable to pay her own attorney fees is not supported by the record. It is undisputed that Riga will receive $57,000 from the equal division of the parties' AXA investment account, and $33,500 from Saks's purchase of Riga's interest in the marital home. Saks also asserts that Riga has additional cash hidden in shares of Prudential stock, two Gift of Israel accounts, two savings accounts, and one checking account. Finally, Saks argues that Riga's FERS pension is worth approximately $1,000,000, and she also has a Thrift Savings Plan of unknown value.

**{¶91}** As previously discussed in the second and sixth assignments of error, the FERS had a present value of $177,911.96, as of November 12, 2012, because it had vested but not matured. According to the coverture formula described by Riga's expert pension evaluator, this figure represents the marital portion of the pension earned during the marriage.

**{¶92}** The evidence at trial showed that the Gift of Israel accounts are in effect custodial accounts intended to finance the children's trips to Israel with their school. Saks's payment of $33,500 is for the purchase of Riga's one-half interest in the equity in the marital home. Riga's Thrift Savings Plan is a deferred compensation plan offered through her employer to supplement retirement benefits she may receive through FERS. The trial court ordered that each party roll over one-half of the balance of his or her retirement accounts, including Riga's Thrift Savings

Plan, to the other spouse's retirement accounts, thus equalizing both retirement accounts.   These distributions were made to equally divide the marital assets.

{¶93} Saks received free legal services from his colleagues at Jones Day.   Thus, Riga owed the only attorney fees paid for legal representation in this divorce.   Although Riga arguably had sufficient means to pay her attorney fees, the court equalized the cost of attorney fees between the parties just as it equalized the marital assets.   Arguably Riga earns enough income to support herself, but equity justified an award of spousal support.   The same holds true for the court's award of 50 percent of Riga's attorney fees.   In this way, the court has equally divided the parties' assets and liabilities.   This was not an abuse of discretion.

{¶94} The eleventh assignment of error is overruled.

### Cross-Assignment of Error

{¶95} In her sole cross-assignment of error, Riga argues the trial court erred when it ordered the Cuyahoga County Child Support Enforcement Agency ("CSEA") to collect the temporary support arrearage Saks owed Riga.   She contends the order failed to specify that CSEA should continue to collect portions of the temporary support order that Saks was required to make directly to Riga in addition to payroll deductions from Saks's wages.   We agree.

{¶96} On May 30, 2012, the trial court granted Riga's motion for temporary spousal support and ordered Saks to pay Riga $2,000 per month, exclusive of child support.   The order also required Saks to make mortgage payments on the marital home and to pay automobile insurance on Riga's car. The temporary support order was retroactive to March 1, 2012, the approximate date the motion was filed.

{¶97} Saks admitted at trial that he never reimbursed Riga for the mortgage payments she made for the months of March, April, May, and June 2012, which included an additional escrow

charge. Riga made these mortgage payments, three of which totaled $2,087.44 each, and one that totaled $2,054.90. She also paid an escrow charge in the amount of $373.47 for a total of $8,690.69 in mortgage payments. Riga paid $534 for car insurance. Since Saks was ordered to pay these expenses and he admittedly failed to do so, Riga is entitled to this spousal support arrearage totaling $9,224.69.

{¶98} Saks argues there was ample evidence from which the trial court could conclude that the mortgage and insurance payments were satisfied by overpayments he made in the amount of $6,452 during the pendency of the case, plus a $2,770.67 set-off representing an amount Riga owed Saks to equalize the life insurance policies. Since the divorce decree specifically states that the $2,770.67 set-off was to be applied to the arrearage Saks owed Riga under the court's May 30, 2012 order, that amount should be subtracted from the total amount of the spousal support arrearage, including the additional $9,224.69, representing the amount Riga made in mortgage payments and car insurance.

{¶99} With respect to the $6,452 Saks claims were "overpayments," Saks asserts that the $2,300 he paid on clothes for the children, and the $1,000 he paid for ten months of his daughter's smart phone service should be attributed to spousal support because he was not ordered to pay these expenses. However, the spousal support order did not assign these expenses to Riga either. In *Rossi v. Rossi*, 8th Dist. Cuyahoga Nos. 100133 and 100144, 2014-Ohio-1832, ¶ 52, this court held:

> Under R.C. 3121.45, the payment of money directly to a child who is subject to a support order is deemed a gift, not a support payment. A similar rule applies to expenditures made on behalf of a child outside a child support order. *See*, *e.g.*, *Hurley v. Austin*, 8th Dist. Cuyahoga No. 99992, 2013-Ohio-5592, ¶ 29 (payments made to school on behalf of the children or to mother directly after the issuance of temporary support order "were appropriately treated as gifts").

Therefore, Saks may not be credited with $2,300 he voluntarily paid for his children's clothes and cell phone service.

{¶100} Saks also asserts that Riga's retention of his share of the parties' 2011 tax refund should be credited toward the spousal support arrearage. As previously stated, the trial court held that Saks was not entitled to the $3,000 he claimed for his share of the 2011 tax refund because "he stopped providing any support for the defendant *and the minor children* in December 2011, in part because he knew * * * [Riga] would be receiving an Eleven Thousand Dollar ($11,000) Federal tax refund." The magistrate's decision further explained that although Saks was able to keep his share of the refund by not paying child and spousal support, Riga "was required to expend her share in order to support herself and the parties' minor children."

{¶101} Although the temporary spousal support order was effective as of March 1, 2012, the magistrate obviously considered Saks's previous support payments when it rendered its decision. The court concluded that since Saks stopped supporting Riga and the children in anticipation of Riga's receipt of the 2011 tax refund, he was not entitled to his $3,000 share of that refund. Further, since Riga spent some, if not all, of Saks's $3,000 tax refund on the children, the amount spent to support the children is not attributable to Saks's spousal support obligation. However, there is no evidence from which we can determine what amount of money Riga spent to support the children from December 2011 until March 1, 2012.

{¶102} Riga raised the issue of unpaid spousal support in a motion to show cause she filed in August 2012. "'The party asserting a show cause motion has the burden to prove that a breach has occurred by clear and convincing evidence.'" *King v. King*, 11th Dist. Geauga Nos. 2012-G-3068 and 2012-G-3079, 2013-Ohio-2038, ¶ 23, quoting *Nolan v. Nolan*, 11th Dist. Geauga No. 2007-G-2757, 2008-Ohio-1505. Riga has not provided any evidence from which

we can delineate what portion of the approximately $3,000 was spent on the children and what amount should be attributed the spousal support arrearage. Therefore, Riga failed to meet her burden with respect to this portion of the arrearage.

**{¶103}** In sum, Riga was entitled to an additional spousal support arrearage totaling $9,224.69 for mortgage payments and car insurance. Saks was entitled to a set-off in the amount of $2,770.67 to equalize the values of the parties' life insurance policies. This amount should be deducted from the total spousal support arrearage, i.e., $9,224.69 plus any other outstanding spousal support arrearage. Additionally, because Riga failed to establish how much of the 2011 tax refund should have been attributed to spousal support, the entire $3,000 should be deducted from the total spousal support arrearage as well. The $9,224.69 spousal support arrearage less $3,000 is $6,224.69. This amount should be added to the spousal support arrearage collected by CSEA from payroll deductions.

**{¶104}** The cross-assignment of error is sustained in part and overruled in part.

**{¶105}** The trial court's judgment is affirmed in part and reversed in part. We remand this case to the trial court to enter an order that will direct CSEA to collect from Saks an additional $6,224.69 less the $2,770.67 set-off, if it has not yet been applied to the spousal support arrearage.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the domestic relations division to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

EILEEN T. GALLAGHER, JUDGE

EILEEN A. GALLAGHER, P.J., and
PATRICIA ANN BLACKMON, J., CONCUR