[Cite as *Kobal v. Kobal*, 2018-Ohio-1755.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105921**

**KATHLEEN MARIE KOBAL**

PLAINTIFF-APPELLEE

vs.

**JOHN EDWARD KOBAL**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DR-15-360082

**BEFORE:** Kilbane, P.J., S. Gallagher, J., Laster Mays, J.

**RELEASED AND JOURNALIZED:** May 3, 2018

**APPELLANT**

John E. Kobal, pro se
Inmate No. 523753
Southeastern Correctional Facility
Hocking Campus
P.O. Box 59
Nelsonville, Ohio 45764


**ATTORNEY FOR APPELLEE**

Darren W. DeHaven
Law Office of Darren DeHaven
3500 Massillon Road - Suite 410
Uniontown, Ohio 44685


MARY EILEEN KILBANE, P.J.:

{¶1} Defendant-appellant, John E. Kobal ("John"), brings this pro se appeal challenging the trial court's order adopting the magistrate's decision regarding divorce proceedings instituted by plaintiff-appellee, Kathleen M. Kobal ("Kathleen"). For the reasons set forth below, we affirm.

{¶2} John and Kathleen were married in November 1976. Two sons were born of their marriage, both of whom were emancipated at the time of the divorce proceedings. In December 2015, Kathleen filed a complaint for divorce. In December 2016, a contested trial was held before a magistrate judge.[1]

---

[1] John appeared by video conference because he was incarcerated at the time of trial.

{¶3} The following was adduced at trial. Six years before the Kobals were married, John purchased a home on Velma Avenue in Parma, Ohio ("the Velma Avenue home" or "the home"). The Kobals lived in the home together after they were married. In October 1993, John transferred his sole interest in the home to Kathleen by quitclaim deed. At trial, John explained that he transferred the property to Kathleen to insulate the property from attachment by his business creditors.

{¶4} In the late 1990s, the marriage began to deteriorate and Kathleen began to handle her own finances. Kathleen explained that John controlled all the finances early in their marriage, and he "was very guarded with his finances and his business" throughout the marriage. Kathleen testified that she lived modestly during the marriage, and that the family was often in debt.

{¶5} At one point during the marriage, Kathleen realized that over $100,000 had "disappeared" from a joint savings account the couple opened for the purpose of saving to purchase a larger home. When Kathleen asked John about the withdrawal, he had no explanation "other than [the money] was going to be used and we were going to get the house." Kathleen also realized that John had numerous bank accounts and investments that she had not been aware of early in their marriage. Kathleen later became aware that John had loaned money to numerous individuals. She presented loan agreements as well as cognovit and promissory notes that reflected that John had made various loans to a number of individuals and entities in amounts ranging from $10,000 to $64,000.

{¶6} John acknowledged that a few of these individuals still owed him money. The magistrate questioned John as to where the returns on his loans and investments went. John did

not directly answer the question, but instead claimed that Kathleen spent "150 to 300 thousand dollars over the course of the marriage on clothes and gifts for other people."

{¶7} In 2001, Kathleen filed for divorce, but later voluntarily dismissed her complaint. John purchased his own home in 2004.

{¶8} In October 2006, John was arrested for criminal charges involving a minor. That same month, he executed a general power of attorney, naming Kathleen his attorney-in-fact. The three-page-long power of attorney provided Kathleen with various powers over John's estate and affairs. Notably, the document permitted Kathleen "[t]o make gifts to members of my family and to charitable organizations within discretion of my attorney-in-fact notwithstanding the fact that my attorney-in-fact may be making gifts to [herself.]" The power of attorney also permitted Kathleen to "bargain, sell and convey in fee simple by deed * * * the whole or any part of any lands, tenements or hereditaments owned by me, or any interest therein[.]"

{¶9} In November 2006, John, along with two of his business partners, helped Kathleen set up KMK Consulting, L.L.C. ("KMK Consulting"). John purported to help Kathleen set up KMK Consulting to allow her to pursue her dream of owning and operating a catering business. Kathleen also testified that John expressed concern to her about his potential civil liability related to the criminal charges he faced. She explained that he used KMK Consulting as a vehicle "to protect the family from financial ruin." Kathleen further explained that John used KMK Consulting to channel his own personal investments, explaining "John had agreements with [his business partners]. [John] had invested money and out of those accounts, KMK Consulting and KMK Title, John was going to reap interest. Didn't happen." Two months after KMK Consulting was established, Kathleen, on behalf of the entity, entered into an investment agreement with Brian A. Cole and Associates ("Cole and Associates"), an eponymous

entity owned by one of John's business partners. Kathleen introduced a letter from John to their son in which John explained in part "KMK Consulting was created to replace my involvement in the investments with [Cole]." Kathleen testified that she had no real involvement in the investment agreement with Cole and Associates, but that "John set [the investment] up with [Cole.]" She explained that she attempted to collect from Cole on behalf of KMK Consulting without success.

{¶10} Additionally, before John was incarcerated in April 2007, he transferred a number of his interests to KMK Consulting, including an Edwards Jones investment account and an RBC Wealth management account.

{¶11} John testified that his mother left him money when she died in 2002, which he invested in the account with Edward Jones. He estimated that at the time he was incarcerated in April 2007, the account was worth approximately $160,000. At the time of trial, the account had a value of $165,795.90. At trial, John initially claimed to have no memory of transferring the money, claiming "[Kathleen] moved the money from my [Edward Jones] account into KMK Consulting." On cross-examination, Kathleen's counsel presented John with a receipt of the transfer authorization with his signature. John then admitted to authorizing the transfer, explaining that he transferred the account to KMK Consulting to insulate this asset from attachment in any potential civil action related to the criminal charges he faced. John further testified that he and Kathleen had "a verbal understanding that [the funds were] not to be touched," because it was his "inheritance money." He admitted there was no written agreement providing Kathleen could not use or retain the funds. John further admitted he had transferred the Edward Jones and RBC Wealth Management accounts to KMK Consulting to protect these assets.

{¶12} In July 2010, Kathleen was diagnosed with stage 4 non-Hodgkin lymphoma and transferred her interest in the Velma Avenue home to her and John's two sons by quitclaim deed. At the time of trial, Kathleen lived in the home with the parties' youngest son.

{¶13} In January 2017, the magistrate issued a decision. The magistrate determined the Velma Avenue home was not subject to a division of property because Kathleen had transferred it to the parties' sons. The magistrate further determined that three separate bank accounts in Kathleen's name were marital property and ordered Kathleen to pay John half the funds on deposit in these accounts. The magistrate also found John was entitled to one-half of the marital portion of Kathleen's benefits through the Ohio Public Employees Retirement System.

{¶14} The magistrate determined the Edward Jones and RBC Wealth Management accounts were Kathleen's separate property by virtue of her ownership of KMK Consulting. The trial court ordered that John would retain any claims that Kathleen or KMK Consulting may have against Cole or any other entities or individuals with whom John had invested money.

{¶15} In May 2017, the trial court adopted the magistrate's decision without modification over John's objection, granting Kathleen a divorce and ordering a division of marital property.

{¶16} It is from this order that John now appeals, raising the following four assignments of error for our review:

### Assignment of Error One

The trial court abused its discretion in failing to utilize a defacto [sic] termination date of the marriage and/or a defacto [sic] date for recognized separation.

### Assignment of Error Two

The court erred in failing to utilize a defacto [sic] termination date in assigning value of the marital estate.

### Assignment of Error Three

The trial court committed prejudicial error when it failed to properly recognize the separate property[,] including [John's] pre-marital owned home on Velma Avenue and previously held property in [John's] Edward Jones account which is his and his alone as a matter of inheritance.

## Assignment of Error Four

A trial court is bound to determine if a magistrate's decision and final judgment and decree of divorce reached an equitable settlement.

## Standard of Review

{¶17} As discussed above, John appeals from the trial court's order adopting the magistrate's decision. We review an appeal from a trial court's decision adopting a magistrate's decision for an abuse of discretion. *Butcher v. Butcher*, 8th Dist. Cuyahoga No. 95758, 2011-Ohio-2550, ¶ 7, citing *O'Brien v. O'Brien*, 8th Dist. Cuyahoga No. 89615, 2008-Ohio-1098, ¶ 11.

## Termination Date of the Marriage

{¶18} In the first two assignments of error, John argues the trial court abused its discretion by failing to find a de facto termination date of the marriage earlier than the date of the final hearing in December 2016. He argues his marriage with Kathleen was effectively terminated as early as 1998.

{¶19} The date of the final hearing in a divorce proceeding is presumed to be the termination date of the marriage, unless the court determines that the use of that date would be inequitable in determining marital property. R.C. 3105.171(A)(2). If the court determines that a de facto termination of the marriage occurred earlier in time, and that using the date of the final hearing as the termination date would be inequitable, the court may, in its discretion, select a date

it considers equitable. *Saks v. Riga*, 8th Dist. Cuyahoga No. 101091, 2014-Ohio-4930, at _ 8, citing *Berish v. Berish*, 69 Ohio St.2d 318, 321, 432 N.E.2d 183 (1982).

{¶20} Generally, a trial court uses a de facto date for termination of marriage "only in cases where the parties have separated; have made no attempts to reconcile; and have continually maintained separate residences, separate business activities, and separate bank accounts." *Id.*, citing *Gullia v. Gullia*, 93 Ohio App.3d 653, 666, 639 N.E.2d 822 (8th Dist.1994). This court "has cautioned that a de facto date should not be used unless the 'evidence clearly and bilaterally shows that it is appropriate based upon the totality of the circumstances.'" *Brown v. Brown*, 2014-Ohio-2402, 14 N.E.3d 404, ¶ 9 (8th Dist.), quoting *O'Brien,* 8th Dist. Cuyahoga No. 89615, 2008-Ohio-1098, at ¶ 41. The trial court has broad discretion in choosing the appropriate marriage termination date and this decision should not be disturbed on appeal absent an abuse of that discretion. *Berish* at 321.

{¶21} Here, the magistrate's decision addressed the court's inability to determine a de facto termination date of the marriage because of the parties' conflicting testimony and the lack of evidence as to assets and liabilities as of the earlier dates for which each party advocated.

{¶22} The magistrate's decision noted that, Kathleen

> pressed the court to use 1998 as the [date of termination] while [John] initially pressed for 2001, the date [Kathleen] filed for divorce [the first time.] * * * In his closing argument, [John] essentially asked the Court to ignore his earlier testimony and, instead, use the date of trial as the end date for determining the duration of the marriage.

The magistrate further explained that

> the parties' testimony is too conflicted to choose either 1998 or 2001 as the de facto date of termination of the marriage. In addition, * * * neither party offered any evidence with regard to what assets they owned on either of those dates or what the assets were worth as well as what debts they were responsible for.

{¶23} Our review of the record confirms the trial court's estimation of the lack of evidence of assets and liabilities as of the de facto termination dates advocated by each party. We agree with the trial court that

> although there are reasons based upon the parties' testimony to consider both dates [for which each party advocated] as the de facto termination of the marriage, the parties * * * failed to present any evidence concerning [their] assets and debts on either date. The court, therefore, cannot divide their assets as required by statute [on either of those dates].

This court has held that "the presence or absence of reliable data concerning the value of the parties' assets is probably the most significant factor the court must consider when selecting a de facto termination date." *Saks*, 8th Dist. Cuyahoga No. 101091, 2014-Ohio-4930, at _ 10.

{¶24} Therefore, we do not find that the trial court abused its discretion in using the date of the final hearing as the termination date of the marriage. Accordingly, the first two assignments of error are overruled.

Distribution of Assets

{¶25} In the third assignment of error, John argues the trial court erred in determining that the Velma Avenue home and the funds in the Edward Jones investment account were not his separate property. As discussed above, the trial court found the home was not subject to a division of property order because Kathleen transferred it to the parties' sons five years before she filed for divorce in the present matter. The trial court also determined that the Edward Jones investment account was Kathleen's by virtue of her ownership of KMK Consulting because John transferred the account to KMK Consulting without restriction.

{¶26} A party asserting that an asset is separate property has the burden of proving that claim by a preponderance of the evidence. *Saks* at _ 35, citing *Rossi v. Rossi*, 8th Dist. Cuyahoga Nos. 100133 and 100144, 2014-Ohio-1832, ¶ 43. "If separate property has been

commingled with marital property, i.e., put together into a common fund, the party seeking to have an asset treated as separate property must also prove by a preponderance of the evidence that the property can be traced to its prior separate identity." *Rossi* at ¶ 43.

{¶27} A trial court's characterization of property as marital or separate property is a mixed question of law and fact that will not be reversed unless it is against the manifest weight of the evidence. *Saks,* 8th Dist. Cuyahoga No. 101091, 2014-Ohio-4930, at ¶ 35, citing *Williams v. Williams,* 8th Dist. Cuyahoga No. 95346, 2011-Ohio-939, ¶ 8. This court will not disturb the trial court's distribution of separate property absent an abuse of discretion. *Id.*

{¶28} Under R.C. 3105.171(A)(3)(a)(i), marital property includes, in relevant part, "[a]ll real and personal property that currently is owned by either or both of the spouses * * * that was acquired by either or both of the spouses during the marriage." Conversely,

> "[s]eparate property" means all real and personal property and any interest in real or personal property that is found by the court to be * * * [a]n inheritance by one spouse * * * during the course of the marriage [or] [a]ny real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage.

R.C. 3105.171(A)(6)(a)(i)-(ii).

{¶29} John, relying on R.C. 3105.171(A)(6)(a)(ii), argues that the trial court erred in determining that the Velma Avenue home was not his separate property because he acquired the home prior to the marriage. John's argument ignores his own testimony that he transferred his interest in the home to Kathleen by quitclaim deed in 1993, more than 20 years before the present divorce filing. In 2010, Kathleen transferred her interest in the property to her and John's two sons.

{¶30} John argues that Kathleen's transfer of the home to their children constituted fiduciary misconduct because it was not in his best interest. As the trial court aptly noted, as a

result of John's transfer of his interest in the property to Kathleen "she was free to do as she pleased with [the home]." Moreover, as discussed above, John's broad power of attorney specifically allowed Kathleen to make gifts to members of his family at her discretion.

{¶31} John further argues the trial court erred in determining the Edward Jones account belonged to KMK Consulting _ he claims the funds in the account are "his and his alone as a matter of inheritance." However, John admitted that he transferred the funds to KMK Consulting in 2007 without restriction. The magistrate's decision explained:

> [I]n voluntarily transferring the Edward Jones account to KMK Consulting [John] voluntarily transferred his interest in a premarital asset [his inheritance] to [Kathleen,] who was the owner of the corporation. The obvious purpose of the transaction was to hide or at least insulate the money from attachment by the [minor victim's parents related to John's criminal conviction.] There is no evidence that [Kathleen] was aware of [John's] purpose when he authorized Edward Jones to make the transfer. And while [John] may not have intended to make a gift of the Edward Jones account to [Kathleen], the effect of authorizing Edward Jones to transfer his account to KMK Consulting had the same effect; it divested [John] of any and all interest that he had in the account. In simple terms, he effectively gave away the account to [Kathleen].
>
> When he did, the account became her property through her ownership of KMK Consulting. There is no writing memorializing any agreement that would require [Kathleen] to turn the account over to [John] in the future once the worry of legal action by the [minor victim's] parents passed. There was not even mention of any such oral understanding [by Kathleen]. [John] simply transferred the Edward Jones account to [Kathleen] with no strings attached.

{¶32} Based on the foregoing, we find that the trial court did not abuse its discretion in determining that the Velma Avenue home and the Edward Jones account are no longer John's property because these findings were supported by competent, credible evidence, including his own admissions.

{¶33} Accordingly, the third assignment of error is overruled.

Equitable Settlement

{¶34} In the fourth assignment of error, John argues that the trial court erred in adopting the magistrate's decision because the "magistrate's findings and award of equity from the marriage did not reach a fair and reasonable division of the assets."

{¶35} The trial court is vested with broad discretion in determining the appropriate scope of property awards in a divorce action. *Wojanowski v. Wojanowski*, 8th Dist. Cuyahoga No. 99751, 2014-Ohio-697, ¶ 9, citing *Berish v. Berish*, 69 Ohio St.2d 318, 319, 432 N.E.2d 183 (1982). "Although this discretion is not unlimited, the trial court has authority to do what is equitable, and its judgment should not be reversed unless it has abused its discretion." *Id.*, citing *Cherry v. Cherry*, 66 Ohio St.2d 348, 355, 421 N.E.2d 1293 (1981). Broad discretion is vested in the trial court to determine an equitable property division because "the different facts and circumstances which each divorce case presents to a trial court requires that a trial judge be given wide latitude in dividing property between the parties." *Id.*, quoting *Koegel v. Koegel*, 69 Ohio St.2d 355, 357, 432 N.E.2d 206 (1982).

{¶36} Here, John argues the division of property was inequitable because "there is no logical explanation for giving [Kathleen] all the money and his pre-marital home [on Velma Avenue] and [awarding John with] all the noncollectable [sic] debt." This argument ignores the trial court's order that Kathleen pay John half the funds on deposit in three separate bank accounts and its finding that John is entitled to one-half of the marital portion of Kathleen's benefits through Ohio Public Employees Retirement System.

{¶37} John specifically takes issue with the trial court's order that Kathleen retain as her sole property the funds in the Edward Jones and RBC Wealth Management accounts by virtue of her ownership of KMK Consulting. However, as discussed above, the trial court heard John

acknowledge he transferred these accounts to KMK Consulting without restriction for the purpose of insulating the assets from collection as proceeds in potential legal action against him.

{¶38} John also contends the trial court's division of property is inequitable because it ordered that he receive, what he terms, "noncollectable debt" from his business partners. However, the record reflects that John created the investments giving rise to these claims for his own profit, of which Kathleen had little or no knowledge. The trial court found "[s]ince [John] is the author of these transactions and is familiar with the people involved they should be his." Upon careful review of the record, we do not find this order inequitable.

{¶39} In fact, we find John's argument to be extremely disingenuous. He admits to using KMK Consulting as a shield for his assets and investments and further admits to transferring property to his wife for that same purpose. The record clearly demonstrates that John kept Kathleen in the dark as to their finances and his business dealings, and that she and her children suffered as a result. The trial court's order was not, as he argues, "retributive justice," but an equitable order to prevent John from further taking advantage of Kathleen. John initiated and orchestrated every financial move and transfer, including transferring the Velma Avenue home to Kathleen and his assets to KMK Consulting.

{¶40} Based on the foregoing, we do not find the trial court abused its discretion in adopting the magistrate's decision, nor do we find an abuse of discretion in the trial court's division of marital property and determination of separate property. Accordingly, the fourth assignment of error is overruled.

{¶41} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, domestic relations division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

_____
MARY EILEEN KILBANE, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
ANITA LASTER MAYS, J., CONCUR